**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Leslie Sayers-Russell,<br><br>               Plaintiff,<br><br>vs.<br><br>Southwest Airlines Company,<br><br>               Defendant. | No.  CV-19-05426-PHX-SPL<br><br>**ORDER** |

## I.    BACKGROUND

Plaintiff Leslie Sayers-Russell worked as a Field Instructor for Defendant Southwest Airlines Company. (Doc. 1 at ¶ 7). In December of 2016, Plaintiff filed charges of discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC) alleging adverse treatment based on her sex by her direct supervisor Paul DiDomenico and Southwest's Regional Manager Darrell Gora. (Doc. 1 at ¶ 14). The charges were resolved through a Mediation Agreement dated January 31, 2017. (Doc. 1 at ¶ 14).

Plaintiff now alleges that beginning in January of 2019 "management, specifically Mr. DiDomenico began criticizing Plaintiff unfairly for her work." (Doc. 1 at ¶ 21). Plaintiff says DiDomenico "sent a critical email to Plaintiff about her not having completed the training conducted on January 28, 2019 within the allotted time." (Doc. 1 at ¶ 22). Plaintiff alleges she told DiDomenico before the training that she would not be able to complete it on time, and that he told her she would "own" her decision, which she took as consent to exercise her professional judgment and instead finish it the following day. (Doc.

1 at ¶ 23). Plaintiff also alleges DiDomenico "criticized Plaintiff for leaving work early [one] day" and "criticized her for not first informing him of her early departure," but "did not criticize the male employees for that similar conduct which was standard practice." (Doc. 1 at ¶ 27). Further, DiDomenico pointed out she inaccurately logged her "Dracula" (timekeeping) data entry, which she thereafter corrected. (Doc. 1 at ¶ 28). Finally, Plaintiff alleges DiDomenico "criticized her performance in a Commodity Tracking Training course." (Doc. 1 at ¶ 35). On June 28, 2019, Plaintiff was terminated. (Doc. 1 at ¶ 40). On October 17, 2019, Plaintiff filed a Complaint in this Court alleging Title VII Discrimination and Retaliation. (Doc. 1 at 8-9). Plaintiff alleges the reasons identified in her termination letter are pretextual. (Doc. 1 at ¶ 44).

On November 6, 2020, Defendant filed this Motion for Summary Judgment. (Doc. 51). Defendant alleges it is entitled to summary judgment on the discrimination claim because Plaintiff "cannot produce sufficient evidence for a reasonable jury to conclude that Southwest's reasons for her termination were a pretext for intentional discrimination." (Doc. 51 at 2). Defendant further argues "there is no evidence that any male employees who worked under Mr. DiDomenico engaged in similar conduct." (Doc. 51 at 8). Regarding the retaliation claim, Defendant alleges it is entitled to summary judgment because Plaintiff "cannot produce sufficient evidence for a reasonable jury to conclude that it terminated her employment because she filed a discrimination charge over three and a half years earlier." (Doc. 51 at 2).

In her Response, Plaintiff argues similarly situated male employees were treated more favorably because "the conduct for which Plaintiff was terminated is similar to, or less egregious than, conduct engaged in" by other male Flight Instructors with the same job duties. (Doc. 55 at 6). Plaintiff also argues Defendant's "asserted reasons for Plaintiff's termination are merely pretext for discrimination and retaliation." (Doc. 55 at 9). Specifically, Plaintiff alleges the proffered reason for her termination of failing to finish her training in a single day is pretextual because "there was no directive" and rather "Plaintiff was told to do what she needed to do and that she would own the decision." (Doc.

55 at 10). Plaintiff also argues the proffered reason of her leaving early without notifying her supervisor is pretextual because "there was no expectation that FIs should notify Mr. DiDomenico of an early departure until a new policy took effect on July 1, 2019." (Doc. 55 at 10). Similarly, plaintiff argues her inaccurate "Dracula" entry was a pretextual reason for her termination because "FIs were not expected to even fill out DRACULA on a daily basis, so long as it was accurate by the end of the month." (Doc. 55 at 11). Finally, Plaintiff argues the complaints about her "lack of knowledge and hostile demeanor" at her Commodity Tracking Training ("CTT") course are pretextual because, among other reasons, she was denied the opportunity to shadow someone before conducting the training but another male FI was permitted to do so. (Doc. 55 at 11-12). Regarding the retaliation claim, Plaintiff argues the three-year time period between the EEOC charge and Plaintiff's termination does not defeat the causal link required for retaliation, and instead a factual issue remains "in light of the timing and surrounding circumstances." (Doc. 55 at 14).

## II.    LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See id*. at 322–23. When considering a motion for summary judgment, a court must view the factual record and draw all reasonable inferences in a light most favorably to the nonmoving party. *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002).

## III.    ANALYSIS

### A. Discrimination

Defendant first seeks summary judgment on Plaintiff's discrimination claim. Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect

to his compensation, terms, conditions, or privileges of employment, because of . . . sex."
42 U.S.C. § 2000e–2(a)(1). To survive summary judgment on her sex discrimination claim,
Plaintiff must show that (1) she belongs to a protected class, (2) she was qualified for the
position, (3) she was subject to an adverse employment action, and (4) similarly situated
individuals outsider her protected class were treated more favorably. *McDonnell Douglas
Corp. v. Green*, 411 U.S. 792, 802 (1973). The burden of production, but not persuasion,
then shifts to Defendant to articulate some legitimate, nondiscriminatory reason for the
challenged action. *Id*. If Defendant does so, Plaintiff must show that the articulated reason
is pretextual "either directly by persuading the court that a discriminatory reason more
likely motivated the employer or indirectly by showing that the employer's proffered
explanation is unworthy of credence." *Texas Dep't of Community Affairs v. Burdine*, 450
U.S. 248, 256 (1981).

It is undisputed that Plaintiff, a female, is a member of a protected class. It is also
not disputed that Plaintiff was qualified for the Field Instructor position,[1] and that Plaintiff
suffered an adverse employment action.[2] The sole issue in dispute is whether similarly
situated individuals were treated more favorably.

"[I]ndividuals are similarly situated when they have similar jobs and display similar

---

[1] Defendant characterizes this element of the *McDonnel Douglas* framework as
whether Plaintiff "was performing her job satisfactorily." (Doc. 51 at 6). However, this
element asks whether the employee has the necessary qualifications (*i.e.*, training,
experiences, education, etc.) for the job, based on objective criteria. *See, e.g., Lynn v.
Regents of Univ. of California*, 656 F.2d 1337, 1345 (9th Cir. 1981) (finding that the
appropriate considerations for whether a plaintiff is "qualified" for a position are "those to
which objective criteria can be applied, such as level of education, years of teaching
experience, in general and at the particular institution, and the publication of scholarly
materials"). Defendant provides no facts or argument that Plaintiff was unqualified for her
position under this framework, so the Court will treat this element as undisputed.

[2] Defendant argues Plaintiff "cannot show that the three incidents where Mr.
DiDomenico criticized her constitute adverse employment actions." (Doc. 51 at 7).
However, Defendant also concedes that "Plaintiff's termination was an adverse
employment action." (Doc. 51 at 7). Accordingly, regardless of whether the criticisms
constitute adverse employment actions, there is no genuine dispute that Plaintiff did suffer
an adverse employment action (her termination)

conduct." *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003), as amended (Jan. 2, 2004) (citing *Wall v. Nat'l R.R. Passenger Corp*., 718 F.2d 906, 909 (9th Cir.1983) (district court did not err in concluding that plaintiff did not show he was treated less favorably than similarly situated employees because other employees had no disciplinary record)). This does not require the employees be "identical; they must simply be similar in all material respects." *Nicholson v. Hyannis Air Serv., Inc.*, 580 F.3d 1116, 1125 (9th Cir. 2009) (quotation and citation omitted). And while "whether two employees are similarly situated is ordinarily a question of fact," summary judgment may be granted when the undisputed evidence shows material differences. *Hawn v. Exec. Jet Mgmt., Inc*., 615 F.3d 1151, 1157 (9th Cir. 2010) (citation omitted). The main issue presented here is whether other Field Instructors engaged in similar conduct as Plaintiff.

Defendant argues there is no genuine issue of material fact that Plaintiff is not similarly situated to the other Field Instructors because Plaintiff "does not know whether any other female or male trainers were, like her, unable to complete their instructor-led training in one session" and is not "aware of any other individuals who received negative feedback from a Subject Matter Expert regarding their CTT." (Doc. 51 at 8). Additionally, Plaintiff "cannot point to any male instructors who left early without notifying their supervisor, overstated their hours, and ignored their supervisor's explicit request for an explanation." (Doc. 51 at 8).

First, there remains a genuine issue of material fact regarding whether other Field Instructors routinely left work early without notifying DiDomenico. Defendant alleges DiDomenico had given the Field Instructors "guidance . . . to advise via Verbal, call, text, or email, if they are leaving early so that [he] is aware if any questions arise" and that "all other members of the team" follow the guidance. (Doc. 52 at 5). Plaintiff alleges the guidance didn't go into effect until July 1, 2019 (a mere three days after she was terminated), but that before then it was "not standard practice" to let DiDomenico know they were leaving early. (Doc. 52 at 5-6). For example, she alleges Travis Holt, another FI, was "habitually late" and "frequently arrives late for his shift and leaves early." (Doc. 56

at 17). And David Vader, another Field Instructor, testified he was late to a shift one day and did not notify DiDomenico but was not disciplined. (Doc. 56 at 18); (Doc. 56-1 at 37). He also confirmed Plaintiff's assertion that, before the formal change in policy, it was not standard to text or email DiDomenico when they left early. (Doc. 56-1 at 36).

To be sure, Defendant provides several text messages from team members, including Plaintiff, notifying DiDomenico that they were leaving early. (Doc. 52-4 at 12-27). Further, DiDomenico testified in his deposition that he expected people to tell him if they were going to leave early. (Doc. 52-3) at 12). However, he did not testify as to whether that expectation was communicated to the team before the July 1, 2019 formal policy, or how often team members in fact met that expectation. Further, Plaintiff testified that it was more generally accepted to let the other FIs know they were leaving early but was not necessary to tell DiDomenico. This notion is supported by one of her texts to DiDomenico, where she states "We advised Dave. Wanted you to be aware." (Doc. 54-2 at 26). Plaintiff also told Defendant in her termination interview that she did not advise DiDomenico she was leaving early because "nobody ever does that and that was never the expectation" and that she had advised him about leaving work early before, "but for a different situation." (Doc. 54-2 at 33). Just because there is evidence that Field Instructors at times did notify DiDomenico they were leaving early does not mean they would be admonished if they failed to do so (at least before the formal guidance).

There is also an issue of fact regarding whether other Field Instructors were treated more favorably after inaccurately logging their "Dracula" entries. Mr. Vader testified that "the instruction on DRACULA was more of, you know, fill it out weekly. So some people did it, you know, daily. Some people did it, you know, once a month. Some people did it at the end of the week, you know, that type of thing. So it varied. There was no clear, you know, guidance as far as when you were expected to do your DRACULA." (Doc. 56-1 at 27). Instead, Vader explained that it was only important to "make sure you have your DRACULA caught up for the month." (Doc. 56-1 at 27). Further, Mr. Vader testified that when he over-reported the number of hours he worked one day and then left early,

DiDomenico merely "follow[ed] up and confirm[ed] the integrity of this reporting," and Vader testified he had "never, ever ever been spoken to, ever, ever" about the time entry. (Doc. 56 at 18). Further, DiDomenico testified that he did not recall whether he disciplined Vader, and there is no documentation that he was disciplined. (Doc. 56 at 18).

There also remains a dispute of fact regarding whether male Field Instructors were treated more favorably after receiving poor reviews on their trainings. Defendant points out that Plaintiff cannot identify other FIs who received negative feedback from a Subject Matter Expert regarding their CTT. (Doc. 52 ¶¶ 57-59). However, Plaintiff alleges that management "previously responded to reports of male Field Instructor's poor performance conducting the FLY training class, by assigning him alternative duties and job coaching" and that the male Field Instructor "received no discipline or termination." (Doc. 1 at ¶ 48). Defendant denies this allegation. (Doc. 10 at ¶ 48). Further, one of the male Field Instructors was permitted to shadow another instructor before conducting his own CTT. (Doc. 56 at ¶ 55). When Plaintiff asked to shadow someone, she alleges she was denied the request. (Doc. 56 at ¶ 55). Denying Plaintiff's request to shadow someone before giving the CTT but allowing another male coworker to do so casts doubt on Defendants' argument that the male Field Instructors were not similarly situated because they didn't engage in the same misconduct (*i.e.*, poor training performance).

To be sure, Plaintiff admits she "does not know whether any other female or male trainers were also unable to complete their instructor-led training in one session." (Doc. 56 at ¶ 29). However, Defendant's stated reason for her termination as it related to this training session was her "failure to follow instructions." (Doc. 56 at ¶ 62); (Doc. 52-4 at 43). But Plaintiff alleges that, rather than directly ordering her to finish the training in one day, DiDomenico told her she would "own the decision" to finish the training the next day instead. (Doc. 56 at ¶ 22); (Doc. 56-1 at 23). Plaintiff took that to mean she should "do what [she] needed to do." (Doc. 56-1 at 23). In contrast, DiDomenico alleges he actually told Plaintiff she would have to "own the decision *and consequences*" of not completing the training. (Doc. 56 at ¶ 22). This is a genuine and material dispute. If Plaintiff's version

of the facts is accepted as true, reasonable jurors could find that Plaintiff did not fail to follow direct instructions.

Accordingly, there remain genuine disputes of material fact regarding whether Plaintiff engaged in similar misconduct, but was treated less favorably, than the other male Field Instructors.

### B. Retaliation

"To make out a prima facie case of retaliation, an employee must show that (1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action." *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). It is undisputed that Plaintiff engaged in protected activity when she filed her EEOC charge in 2016. It is also undisputed that Plaintiff suffered an adverse employment action (her termination). Only the causal link is at issue.

The causal link between the protected activity and the adverse action alleged to be retaliatory must be "proved according to the traditional principles of but-for causation." *Univ. of Texas Southwestern Med. Center v. Nassar*, 570 U.S. 338, 360 (2013). In other words, "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Id.* at 352 (citation omitted). Here, Plaintiff must show that, but for her 2016 EEOC charge, Defendant would not have fired her.

Defendants sole causation argument centers around the fact that "Plaintiff's discrimination charge was resolved several years before her termination." (Doc. 55 at 12). While it is true that temporal proximity between the protected activity and the adverse employment action is not, by itself, enough to establish causation, it does factor into the equation. For example, Defendant cites *Villiarimo*, 281 F.3d at 1065 for the proposition that a "[n]early 18-month lapse between protected activity and an adverse employment action is simply too long, *by itself*, to give rise to an inference of causation." (emphasis added); *see also Cooper v. Dignity Health*, 438 F. Supp. 3d 1002, 1015 (D. Ariz. 2020) (cited for the proposition that "given that the alleged adverse employment action 'occurred

more than five months after Plaintiff first requested an accommodation, the temporal proximity *is not sufficient* to create an inference of causation'") (emphasis added); *Foraker v. Apollo Group, Inc*., 427 F. Supp. 2d 936, 943 (D. Ariz. 2006) (cited for the proposition that "an approximately six month 'time lapse between Defendant's knowledge of the protected activity and the decision to issue a sub-standard performance evaluation is too long, *standing alone*, to establish a prima facie case of retaliation'") (emphasis added). But temporal proximity is not the only evidence of causation presented in this case.

Plaintiff alleges she asked DiDomenico why he didn't directly order her to finish her instructor-led training in one day, rather than telling her she would "own" her decision. (Doc. 1 at ¶¶ 25-26). She alleges DiDomenico responded by saying he did not want her to file another EEOC claim. (Doc. 1 at ¶¶ 25-26) (Doc. 56-1 at 39). Plaintiff documented this conversation in her personal notebook, writing that DiDomenico said he "didn't want her going to the EEOC," a conversation that she notes took place on March 1, 2019. (Doc. 56-2 at 20). Though the EEOC complaint was filed three years before her termination, evidence in the record indicates the complaint was referenced as recently as four months before Plaintiff's termination, and that DiDomenico still harbored resentment for the EEOC complaint. Accordingly, there is a dispute of fact regarding whether, but-for Plaintiff's 2016 EEOC charge, Defendant would have terminated her.

**C. Pretext**

Defendant argues that "[e]ven if Plaintiff could establish a prima facie case of discrimination, Southwest has articulated legitimate, nondiscriminatory reasons for her discharge as described in her termination memorandum." (Doc. 51 at 9). Defendant argues "Plaintiff cannot show that those reasons were a pretext for unlawful retaliation." (Doc. 51 at 12). The legitimate, nondiscriminatory reasons offered by Defendant are Plaintiff's failure to complete the training on the day it was supposed to be completed, her poor reviews on the CTT, logging inaccurate hours in the company's "Dracula" system, and leaving early without notifying DiDomenico. (Doc. 52-4 at 31-36). Plaintiff alleges these reasons are pretextual. (Doc. 1 at ¶ 44).

"To demonstrate pretext, the complainant must show that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Clarken v. Pritzker*, No. CV-12-00907-TUC-BPV, 2015 WL 1884012, at *9 (D. Ariz. Apr. 24, 2015), aff'd, 670 F. App'x 583 (9th Cir. 2016) (citing *Warren v. City of Carlsbad*, 58 F.3d 439 (9th Cir. 1984)). For many of the reasons already stated, there remain issues of fact regarding whether Defendant's proffered reasons for terminating Plaintiff are legitimate or are instead pretextual.

There is a dispute of fact regarding whether Defendant gave Plaintiff permission to exercise her judgment and end her training early. Reasonable jurors could differ on how to interpret DiDomenico's statement about Plaintiff "owning" her decision, and Plaintiff's version of the facts would tend to show that Plaintiff's "failure to follow instructions" is a pretextual reason for her termination. Similarly, there remain issues of fact regarding whether other FIs were permitted to shadow other trainers while Plaintiff was denied that opportunity, and whether other FIs received negative reviews on similar trainings without being terminated. If so, Plaintiff's poor reviews on her CTT as a reason for her termination would be entitled to less credence. Finally, there are genuine issues of fact regarding whether FIs routinely left work early without notifying DiDomenico first, and whether other FIs incorrectly logged time into "Dracula" without punishment. Accordingly, there remain genuine disputes of fact regarding whether Defendant's proffered reasons for terminating Plaintiff are legitimate nondiscriminatory reasons, or are instead pretextual.

///
///
///
///
///
///
///
///

10

IV.    **CONCLUSION**

In sum, there are genuine disputes of material fact regarding whether other similarly situated employees were treated more favorably than Plaintiff, and whether Defendant's proffered reasons for terminating Plaintiff are pretextual. Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. 51) is **denied**.

Dated this 15th day of January, 2021.

Honorable Steven P. Logan
United States District Judge

11